Filed 12/2/21  In re Emma P. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In the Matter of EMMA P. et al., Persons Coming Under Juvenile Court Law. | B310149 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARISA P.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP02944A-B) |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Reversed in part, affirmed in part.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichavi for Plaintiff and Respondent.

_____

## INTRODUCTION

The material facts in this appeal are undisputed.  On May 17, 2020, father T.P. (who has not appealed) shook his one-month-old son G.P. because he would not stop crying.  Appellant mother Marisa P. was out at the time, but noticed G.P. exhibiting seizure-like symptoms after she returned.  Father professed ignorance of the cause of G.P.'s symptoms, and Mother called 911.  Three days later, while G.P. was still hospitalized, Mother learned his doctors suspected shaken baby syndrome.  After discovering the doctors' suspicions, Father confessed his actions to Mother, the maternal grandmother, and the maternal aunt (Mother's sister, who was a public defender).  The aunt advised Father and Mother not to talk to anybody until they consulted with counsel.  As a result, Mother did not inform G.P.'s doctors of Father's confession.

On May 29, 2020, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition on behalf of G.P. and his sister Emma (born February 2018), alleging jurisdiction under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (e), and (j).  At a

detention hearing held June 3, 2020, Mother testified about when she had learned of Father's actions, and why she had not told anyone before.  While the court did not approve of Mother's failure to disclose, it concluded she posed no risk to the children, and released them to her custody.

Six months later, a different judge found jurisdiction over the children on various grounds.  The only grounds involving Mother were under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j), alleging that she failed to protect G.P. "by not timely advising medical providers of the cause of the child's injuries once she became . . . aware of that cause."  Though the court has since terminated jurisdiction and released the children to Mother, Mother urges us to consider her appeal in which she argues, among other things, that the court erred in assuming jurisdiction because there was no current risk of harm to the children at the time of the adjudication hearing.  DCFS has not argued to the contrary on appeal, and we agree.  We therefore reverse the finding of jurisdiction on the counts involving Mother's failure to disclose.

## STATEMENT OF RELEVANT FACTS

### A.  *DCFS Investigates a Referral*
On May 20, 2020, DCFS received a referral alleging physical abuse of G.P. (born April 2020).  The report stated that three days earlier, Mother had observed G.P. to be limp, pale, and exhibiting seizure symptoms.  She called 911 and

G.P. was admitted to a pediatric intensive care unit. Upon further testing, G.P. was observed to have bloody cerebrospinal fluid. He was intubated, and his brain MRI showed bilateral subdural hematomas.[1] Additional testing revealed bilateral severe retinal hemorrhages. There were concerns that the injuries were caused by "non-accidental trauma, as mother did not mention prior injuries or head injuries," but it was also noted that "infection-related causes ha[ve] not been ruled out and there is more testing planned for the next several days." A medical social worker spoke with Mother, who denied any concerns of child abuse. She explained she had gone to the store on May 17, leaving the children with Father, but after returning home, noticed the onset of seizures in G.P.

On May 20, a children's social worker (CSW) later telephoned Mother, and after Mother expressed confusion over DCFS's involvement, she provided the CSW with the address of the maternal aunt's house, where the family was staying. The maternal aunt -- who was a public defender -- then joined the call, stated she was an attorney, and refused to let the CSW speak further with Mother. When asked if she, Mother, Father, and Emma could meet with the CSW at the hospital, the maternal aunt refused, but stated the CSW could come to the aunt's house.

After this conversation, a doctor spoke with the CSW and two detectives from the Los Angeles County Sheriff's

---

[1]     A hematoma is a localized bleeding outside of blood vessels.

4

Department.  He opined that no child at G.P.'s age should be having seizures, and that the results of an MRI "'swings [the cause of his symptoms] from infection more towards trauma.'"  The doctor "clarified that it is still possible, but less likely now, for the cause to be an infection," and that the "infection markers," which they were still awaiting, had been negative so far.  The doctor also stated that an eye specialist had observed an edema (swelling) behind G.P.'s eye, adding to the likelihood that his injuries were caused by trauma.  The doctor said the injuries appeared to have been caused by "'severe shaking,'" possibly within the past week.  Additional tests would be done to allow the doctors to make a final determination of the cause of the injuries.

The CSW and detectives went to the home of the maternal aunt, who refused to allow them to enter or speak with the parents or to see two-year-old Emma.  On May 21, 2020, the court granted an after-hours removal order for the children.  Two social workers, accompanied by law enforcement, removed Emma from the parents.


### B.   *DCFS Files a Petition*

On May 29, 2020, DCFS filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), and (j) on behalf of Emma, and subdivisions (a), (b)(1), and (e) on behalf of G.P.  Counts a-1, b-1, and j-1 identically alleged that G.P. was suffering from serious injuries "consistent with inflicted trauma" and which "would not

5

ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by the child's parents," but that the parents "gave no explanation of the manner in which the child sustained the child's injuries." Counts b-2 and j-2 identically alleged that after G.P. was injured, the parents "failed to obtain emergency and timely medical care for the child's injuries." Count e-1 alleged that G.P. was seriously injured in a manner consistent with inflicted trauma, and that the parents knew or should have known he was being physically abused and failed to protect him.

At the June 3, 2020 detention hearing, Mother was called to testify; she explained that after her sister had refused entry to the CSW and law enforcement on May 20, Mother had called the hospital to ask why a social worker wanted to speak with her. She learned that the hospital "had to file a report of child abuse, which they believe[d] was shaken baby syndrome." Mother became upset and after she hung up the phone, Father approached her, crying and apologizing. He confessed to shaking G.P. because the infant would not stop crying. Mother screamed for her sister and mother and, when they arrived, Father confessed to them as well. Mother did not call the police because her sister advised her not to speak with anyone without an attorney. On May 31, 2020, after she spoke with her dependency attorney, Mother attempted to call a social worker to inform her of what had happened, but was unable to reach her; she also e-mailed the social worker, asking for a call-back. Prior

6

to this incident, Mother had never observed Father be violent toward her or the children.

The court (Judge Martha A. Matthews) found that while the children should be detained from Father, DCFS had not met its burden of proof to demonstrate they should be detained from Mother. The court found Mother credible, and believed that prior to this incident, she had no reason to believe her children were at risk. The court noted that when Mother observed seizure signs in G.P., she immediately called 911. The court acknowledged Mother's failure to inform the police regarding Father's confession, but did not find this to be evidence of lack of protective capacity because, by the time of the confession, "the doctors . . . had already determined that someone had shaken" G.P., and he was "already in the hospital receiving all appropriate medical care." The court noted it would have been a "different matter" if Mother had "withheld information that was critical to the baby's medical treatment." Over the objections of DCFS's counsel and the children's counsel, the court released the children to Mother, provided they reside in a DCFS-approved location.[2]

---

[2] At DCFS's request, the court stayed the order for five days to permit DCFS to interview the maternal aunt and grandmother regarding Mother's testimony. After DCFS concluded its interviews, it asked the court to modify its previous order. The court declined and lifted the previously imposed stay, ordering the children released to Mother under DCFS supervision, with Mother residing with the maternal grandmother or at some other DCFS-approved housing.

### C.  *DCFS Continues to Investigate*

In a subsequent interview with DCFS, Mother made statements consistent with her testimony at the detention hearing and denied the children were at risk in her care. She emphasized that Father had been "'an amazing father to Emma,'" and that she "'never feared him or thought that he could cause harm to our children.'"  A CSW stated she had observed "'great improvements in'" G.P., and opined that Mother was "'organized and good at advocating' for her children's needs."

DCFS also obtained medical records, which stated that as of May 26 -- six days after Mother discovered what Father had done -- medical professionals were continuing to determine the cause of G.P.'s symptoms.  A May 20 entry stated the doctor was "highly concerned for NON-ACCIDENTAL TRAUMA" and that an "echocardiogram and CT abdomen/pelvis" were needed "to rule out trauma." "[M]etabolic and infection" were given as "[d]ifferential diagnoses."  A May 21 entry noted the medical team "sen[t] for more labs to rule out metabolic and rare infectious causes" but that "[t]rauma is the only unifying diagnosis as no other etiology can explain[] the whole constellation of abnormalities."  The records indicated additional tests would be done, and a May 26 entry indicated the results of those tests were negative for infection, but that a further test would be performed.

**D.    *Adjudication and Disposition***

Six months later, in December 2020, Judge Jean M. Nelson held an adjudication hearing.  Mother testified in a manner consistent with her testimony at the detention hearing.  Regarding her call to the hospital after DCFS's initial visit, she testified that the doctor told her "there was a suspicion of shaken baby syndrome," but did not "express any uncertainty as to there being any other cause for" G.P.'s symptoms.  Mother stated the doctor had informed her they were waiting on the results for other tests they had performed.  She admitted knowing that G.P. had a PICC line inserted to deliver antibiotics, which were given to those who had infections.[3]  Mother claimed she told G.P.'s neurologist "what happened," "right after" the children were released to her (on June 8).  Mother testified that according to the doctors and her own observations, G.P. was currently "functioning completely normal right now for his age."

The maternal aunt testified that she was a public defender, and confirmed that it was she who had denied DCFS entry into her home, and had advised Mother and Father not to speak to law enforcement without counsel.  The aunt admitted she had no experience with dependency law.

The court then invited argument.  DCFS's counsel argued that Mother's failure to inform the doctors of the cause of G.P.'s symptoms immediately upon discovery

---

[3]    A PICC line is a peripherally inserted central catheter.

constituted a failure to protect, because G.P.'s diagnosis was still uncertain, and Mother knew that doctors were administering antibiotics and performing additional diagnostic tests that were "completely unnecessary," given the actual cause of G.P.'s symptoms. The children's counsel asked that counts a-1, b-1, and j-1 be amended to state that the parents "gave no *immediate* explanation of the manner in which the child sustained the child's injuries" and argued that while there was little question that G.P. sustained his injuries due to Father's actions, Mother's failure to immediately inform the doctors did not constitute a failure to protect. The children's counsel disputed that G.P. underwent "many" unnecessary diagnostic procedures or suffered any injury after Mother learned the cause of his injuries. Father's counsel asked the court to dismiss the petition for lack of evidence, stating there was no evidence that G.P. suffered detriment following Father's confession. The court adjourned the hearing and stated it would issue a ruling the next day.

The court found that Mother had no role in the initial shaking of G.P., but that "her failure to disclose from between May 20th and the time of June 1st was a failure to protect . . . ."[4] The court opined it was "common sense that the doctors need[ed] to know the cause of injury," and while

---

[4] We understand the court's reference to "June 1st" to mean when Mother testified at the detention hearing. While the detention hearing was initially scheduled for June 1, 2020, it was not held until June 3.

10

the court acknowledged the contrary legal advice Mother received, "her first responsibility is to protect her child regardless of other consequences." The court stated it was "fair to assume that [the withheld information] would have been a key piece of evidence or information for the doctors to figure out the treatment. And Mother was aware that they suspected shaken baby syndrome. They had not ultimately concluded it, and she never tried to change that and ensure doctors understood the cause . . . ."

After amending counts a-1, b-1, and j-1, and count e-1 to remove the allegations regarding Mother, the court sustained these counts as to Father. The court also amended and sustained counts b-2 and j-2 as to Mother. As amended, these counts identically alleged that Mother "failed to protect the child [G.P.] by not timely advising medical providers of the cause of the child's injuries once she became aware of that cause. Such medical neglect of the child on the part of the mother endangers the child's physical health and safety and places the child and the child's sibling Emma P[.] at risk of serious physical harm, damage, and medical neglect."[5] Mother's counsel objected to the amended language "both on the sufficiency of the evidence and [on the ground that] the amended language fails to state a claim."

---

[5] In the initial petition, the counts alleged that Mother and Father "failed to obtain emergency and timely medical care" for G.P.'s injuries.

11

On disposition, with all counsel's agreement, the court removed the children from Father. Over DCFS's objection, the court released the children to Mother, finding that "both children have remained safely in Mother's care so there is evidence that the risk has dropped off." The court further found that "[a]lthough Mother failed to timely tell the medical providers about the shaking, she has since shown herself to be safe and attentive to the children such that the department failed to meet the clear and convincing evidence standard." Mother timely appealed the jurisdictional findings and the allegations sustained against her.

### E. *Post-Appeal*

After the appeal was filed, the court terminated jurisdiction in June 2021, issuing minute orders finding that "conditions which would justify the initial assumption of jurisdiction under WIC section 300 no longer exist and are not likely to exist if supervision is withdrawn . . . ." The court awarded Mother sole legal and physical custody of G.P. and joint legal and sole physical custody of Emma. Subsequently, DCFS declined to file a respondent's brief.[6]

---

[6]     Although DCFS claimed in a request for judicial notice that it was offering evidence of the termination of jurisdiction "for the purpose of expediting an issue on appeal that may now be moot," DCFS made no motion to dismiss the appeal.

## DISCUSSION

### A. *We Exercise Our Discretion to Consider Mother's Appeal*

Though the juvenile court terminated jurisdiction and released the children to Mother, she requests we consider her appeal on the merits, arguing that the outcome of this appeal could shift her status from "'offending'" to "'non-offending'" parent. We agree, and will consider her appeal on the merits. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 763 [deciding potentially moot appeal because "the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent"].)

### B. *Substantial Evidence Does Not Support a Finding of Substantial Risk to the Children at the Time of the Adjudication Hearing*

While the juvenile court found Mother had no role in shaking G.P., it found "her failure to disclose from between May 20th and the time of June 1st was a failure to protect." We agree. While Mother protests an alleged lack of evidence before the court "to support the assumption that mother's failure to disclose father's confession on the night of May 20, 2020 and prior to her testimony on June 3, 2020 resulted in any change in G[.P.]'s course of treatment," we agree with the court that it was "common sense that the doctors need[ed] to know the cause of injury." Because Mother's own testimony established that she knew there was "a suspicion

13

of shaken baby syndrome," but also knew there was no definitive diagnosis, we concur that her failure to disclose what Father had confessed not only subjected the infant to additional tests, but deprived the doctors of information any medical professional would want as soon as possible to deliver optimum care. The fact that G.P. was properly treated is fortunate but fortuitous -- it does not excuse Mother's serious lapse of judgment or negate the risk that lapse posed to her child. In short, substantial evidence supported the court's conclusion that Mother's failure to disclose constituted a failure to protect G.P.

Nevertheless, "dependency jurisdiction is not warranted under [Welfare and Institutions Code section 300,] subdivision (b) if, at the time of the jurisdiction hearing, there no longer is a substantial risk that the child will suffer harm." (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803; Welf. & Inst. Code, § 300, subd. (b)(1) [child comes within jurisdiction of juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness"].) Similarly, "subdivision (j) of section 300 requires a finding of a current risk of abuse, because a child under subdivision (j)

14

must be both a sibling of an abused child and at risk of being abused." (*In re Carlos T.*, *supra*, at 803, italics omitted.)

By the time of the adjudication hearing -- six months after the detention hearing -- there was nothing to suggest Mother posed a substantial risk to the children. In its jurisdiction/disposition report, DCFS noted "'great improvements in'" G.P., and opined that Mother was "'organized and good at advocating' for her children's needs." Mother testified without contradiction that according to the doctors and her own observations, G.P. was "functioning completely normal right now for his age." And the court itself found that "both children have remained safely in Mother's care so there is evidence that the risk has dropped off." Further, the court found that since the time the children had been released to her, Mother had "shown herself to be safe and attentive to the children . . . ." Because we find that substantial evidence does not support a finding that at the time of the adjudication hearing, Mother still posed a substantial risk to either of her children, we reverse the finding of jurisdiction over the children under counts b-2 and j-2. In light of our holding, it is unnecessary to consider any of Mother's other arguments.

15

## DISPOSITION

We reverse the court's finding of jurisdiction over the children under counts b-2 and j-2. In all other respects, the court's jurisdictional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

16